# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BETH GUNTY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 14 C 4756 ) ) Judge Jorge L. Alonso |
| EXELON NUCLEAR SECURITY, | ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Before the Court is defendant's motion for summary judgment [49], which is granted for the reasons explained below.

## BACKGROUND

Plaintiff, Beth Gunty, brought this action against her former employer, Exelon Nuclear Security, LLC ("Exelon"), for unlawful discrimination on the basis of disability and sex, in violation of the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964 ("Title VII").

## LOCAL RULE 56.1

Before reciting the facts, the Court must discuss Local Rule 56.1. "The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination. It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). The Seventh Circuit has "consistently upheld district judges' discretion to require strict compliance" with the Rule. *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015).

Plaintiff failed to comply with Rule 56.1 in several respects. First, throughout her response to Exelon's Rule 56.1(a)(3) statement of material facts, plaintiff states that Exelon's assertions are undisputed or partially disputed but "incomplete" and then goes on to state her own multiple additional facts. That is an impermissible tactic that serves only to clutter plaintiff's response. "Using such evidence to directly dispute the Defendant's facts is fine, but to be considered as facts affirmatively demonstrating why summary judgment should be denied, the Plaintiff's evidence must also appear in [her] statement of additional facts under the local rules. Putting this evidence in the statement of additional facts is necessary because the Defendant has no mechanism to 'reply' to the Plaintiff's responses to the Defendant's facts and thereby dispute the contentions raised in the Plaintiff's responses." *Anderson v. Iacullo*, 963 F. Supp. 2d 818, 821-22 (N.D. Ill. 2013) (ellipsis, citation, and some brackets omitted). The Court has therefore disregarded all additional assertions of fact contained in plaintiff's response to Exelon's Rule 56.1(a)(3) statement that do not directly dispute Exelon's facts. The proper vehicle for asserting additional facts is plaintiff's Rule 56.1(b)(3)(C) statement, which plaintiff submitted.[1]

Second, plaintiff sometimes "disputes" an assertion yet her response is not germane, and she instead provides additional unresponsive facts that do not support a dispute and/or which the cited evidence does not support. In those instances (among them paragraphs 17, 22, 23, 24, and 41), the Court has deemed Exelon's statements admitted. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) (failure to respond as mandated by the local rule results in an admission, and a district court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact") (internal quotation marks and citation omitted); *Burrell v. United Parcel Serv., Inc.*,

---

[1]What is more, the Court allowed plaintiff to submit sixty additional statements of fact rather than the forty statements Rule 56.1(b)(3)(C) permits. (ECF No. 64.)

163 F. Supp. 3d 509, 514 (N.D. Ill. 2016).

Third, in a few instances, plaintiff fails to cite evidence that supports the assertions set forth in her Local Rule 56.1(b)(3)(C) statement or cites evidence that does not support the assertions (for example, paragraph 46), so the Court has disregarded those assertions.

## MATERIAL FACTS

Gunty was employed as an armed security officer at an Exelon affiliate's Braidwood Nuclear Generating Station in Braceville, Illinois from February 2004 until her employment was terminated in December 2012. For the first four years or so of this employment, plaintiff's employer was Wackenhut Corporation, which had a contract to provide security at the generating station until Exelon took over security functions and became plaintiff's employer in 2008. At the time her employment was terminated, plaintiff's formal job title was "senior security officer."

Gunty gave birth to a child on August 31, 2011 and returned to work about a month later. On April 28, 2012, at the beginning of her shift, Gunty became "very angry for no good reason." (ECF Nos. 93 & 94, Dep. of Beth Gunty 46.)[2] She told her supervisor that she was "feeling just not the same" as she normally felt and that she wanted to talk to the nurse at work. (*Id.* at 46-47.) Plaintiff then visited the nurse, Kelli Unger. Gunty told Unger that she was feeling short-tempered, irritable and anxious, and discussed her family- and work-related stress. After their conversation,

---

[2]The Court's standing order requires parties submitting deposition testimony in support of or in opposition to summary judgment motions to file with their briefs the entire transcript(s) of deposition testimony submitted in support of their respective positions. Because both parties submitted only deposition excerpts, the Court subsequently directed Exelon to file the entire transcripts of certain deposition testimony—that of plaintiff and Rebecca Peed. After a review of those transcripts, it became apparent to the Court that a possible explanation for the parties' failure to submit the entire transcripts was the fact that throughout both depositions, counsel for both sides, but Mr. Esposito in particular, behaved uncivilly. They tangled frequently over minutiae. Their rancor appeared to be driven by Mr. Esposito's aggressive demeanor, speechmaking, and repeated assertions of lengthy, argumentative, and suggestive objections.

Gunty was sent home and issued a mandatory referral to Exelon's Employee Assistance Program ("EAP"), which entailed a mandatory leave of absence. Gunty began taking leave under the Family Medical Leave Act ("FMLA") and receiving short-term disability benefits.

As part of the EAP process, plaintiff received mental-health counseling from Linda Gjerde, a licensed clinical social worker. Plaintiff's first appointment with Gjerde was on May 2, 2012, at which time Gjerde recommended that plaintiff have at least one more counseling session with Gjerde and that plaintiff seek a psychiatric evaluation. On June 11, 2012, plaintiff was evaluated by a psychiatrist, Leah Ustas, M.D., who prescribed her medication for depression and anxiety. Thereafter, throughout the summer, plaintiff continued to see Gjerde and Dr. Ustas, whose SOAP notes[3] regarding plaintiff's treatment were communicated to staff at Optum Health (which contracted with Exelon to provide EAP services), and were in turn communicated to staff in Exelon's Occupational Health Services department ("OHS"), which administers FMLA and disability claims.

On September 19, 2012, Rebecca Peed, a Senior Human Resources Generalist for Exelon, sent Gunty a letter stating, in part, the following. As of July 20, 2012, Gunty had exhausted all of her FMLA leave. Peed had not received any notification that Gunty's medical providers had released her to return to work, with or without reasonable accommodations, so Gunty would no longer hold the position of armed security officer. In the event that Gunty was released to return to those duties and was capable of performing the essential functions of the position with or without reasonable accommodations, Gunty would be considered for "open and available" armed security officer positions. Exelon had determined, based on the information provided to OHS by Gunty's

---

[3]SOAP notes are a form of medical record. SOAP stands for "Subjective," "Objective," "Assessment," and "Plan."

doctor, that Gunty was no longer eligible for short-term disability benefits. If Gunty was interested in other jobs with an Exelon company, Exelon would give her a sixty-day job-search period during which she could seek and apply for open and available positions. During this period, Gunty would remain off work without pay and would be required to use vacation, holidays, and other paid time off until such time off was exhausted. If Gunty wanted to "search for open and available positions," she was to let Peed know "as soon as possible," but if Gunty did not contact Peed, no steps would be taken to assist her in seeking other positions with an Exelon company. If Gunty did not obtain a position by the expiration of the sixty-day period, her employment would be terminated at that point. (ECF No. 72-6.)

According to Peed and as Gunty testified at her deposition, Gunty did not contact Peed or the Human Resources department to seek help in obtaining an alternative position. (ECF No. 52-9, Aff. of Rebecca Peed ¶ 10; Gunty Dep. 236.)[4] Plaintiff instead consulted her sister-in-law, Patricia Gunty ("Patricia"), who worked as a secretary for an Exelon company and had access to Exelon's

---

[4]Plaintiff submits an affidavit in response to Exelon's motion in which she states: "On September 25 and 26, 2012 I wrote a note to myself that I called Rebecca [Peed], Senior Human Resources Generalist, to ask why Exelon had terminated my short-term disability benefits and to inform her that I had submitted an application for an [Office Service Specialist] position. [Peed] did not answer her phone and I left a message stating such. I received no follow-up to either of my September 25 or 26, 2012 voicemails." (ECF No. 72-2, Aff. of Beth Gunty ¶ 8.) Attached to the affidavit are plaintiff's purported handwritten notes regarding the call, which Exelon says were not produced in discovery. As Exelon points out, these statements contradict plaintiff's deposition testimony, in which she stated that she did not contact Human Resources for help in obtaining alternative positions because she "didn't know that [she] needed to" and, according to plaintiff, Peed's letter "did not state it needed response." (Gunty Dep. 236-37.) Plaintiff cannot create an issue of fact on summary judgment with an affidavit that contradicts her sworn deposition testimony, in the absence of a credible explanation for the discrepancy. *See Abraham v. Wash. Grp. Int'l, Inc.*, 766 F.3d 735, 741 (7th Cir. 2014) (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)). Plaintiff has provided no such explanation and no explanation for why her notes were not produced in discovery. Thus, she cannot now put forward a different, inconsistent account of her efforts to communicate with the Human Resources department.

5

internal job-posting website, to get information about postings for open positions.

On October 29, 2012, plaintiff's counsel sent Peed a letter that stated in pertinent part: "We represent your employee Beth Gunty concerning her medical and disability claims. She requires accommodation. Beth has applied for other non-security positions. Alternatively, she requires an extended paid leave of absence during the period of her disability." (ECF No. 72-21.) Peed then searched for open positions for which Gunty might have been qualified.[5] Peed determined that the only available position for which Gunty could qualify was an Office Service Specialist ("OSS") position, a clerical job in the Engineering department. (Patricia also notified plaintiff about this position.) OSS jobs involve entering data, editing text, and general clerical work, so typing skills are required. The description for the OSS position stated that the applicant would have to successfully complete the "SASS" test, which assesses clerical skills, including typing. Peed asked Sandi Malone, an employee in the human-resources department, to contact Gunty about the open clerical position and ask her if she wanted to take the SASS test.[6] When Gunty said yes, the department arranged for her to take the test.

Gunty took the three-part SASS test on November 16, 2012, close to the end of her sixty-day job-search period. On November 20, 2012, the human-resources department received the test results; Gunty was "not recommended" on each part of the test.

Because Gunty did not qualify for the OSS position, and because there were no other open and available positions for which she qualified, her employment was terminated. On December 10,

---

[5]Plaintiff has a high school diploma but no higher degree. Her only work experience before her security position was in dental offices.

[6]Gunty disputes this fact but cites no evidence to support her disagreement, and the Court has found none. (ECF No. 72, Pl.'s Resp. to Def.'s L.R. 56.1(a)(3) Stmt. ¶ 29.) Accordingly, the Court deems it admitted.

2012, Peed sent Gunty a letter informing her of the termination, stating that the job-search period had expired and she had not been placed in another position. The letter also stated that if plaintiff's medical restrictions changed at any point in the future, she was welcome to apply for any open and available position with Exelon. (ECF No. 72-22.)

Prior to her termination, Gunty applied for long-term disability benefits. She was notified in a November 9, 2012 letter from the Hartford Life and Accident Insurance Company ("Hartford") that her claim for such benefits had been approved, retroactive to October 27, 2012. (ECF No. 52-6 at 47-49, Letter from Warren J. Ford to Beth Gunty.)

## SUMMARY JUDGMENT STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014); *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 499-500 (7th Cir. 2008). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (citation and internal quotation marks omitted). Rule 56 imposes the initial burden on the movant to inform the court why a trial is not necessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmovant bears the ultimate burden of persuasion on a particular issue, the movant's initial burden may be discharged by pointing out to the court that there is an absence of evidence to support the nonmoving party's case. *Id.* Upon such a showing, the nonmovant must then "make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (internal quotation marks and citation omitted). The nonmovant need not depose her own witnesses or

produce evidence in a form that would be admissible at trial, but she must go beyond the pleadings to demonstrate that there is evidence upon which a jury could find in her favor. *Id.* at 1168-69 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

**DISCUSSION**

**A.     ADA (Count I)**

"There are two types of discrimination claims that may be made under the ADA. First is a disparate treatment claim, where the plaintiff alleges the employer treated him or her differently because of the plaintiff's disability. The second is the employer's failure to provide a reasonable accommodation." *Curtis*, 807 F.3d at 224 (citation omitted). Plaintiff asserts the latter.[7]

As an initial matter, the Court must address the nature of plaintiff's reasonable-accommodation claim. Plaintiff alleges in the complaint that she was discriminated against in that she "requested that she be transferred to a less stressful position other than Armed Security Officer but was refused her accommodation request" and her employment was instead terminated. (Compl. ¶ 12.) At the close of discovery in this case, plaintiff moved to amend her complaint to add a claim that Exelon had failed to accommodate her requests to return to the job of armed security officer with accommodations such as reduced hours, no overtime requirement, and/or "light duty," as well as a claim that Exelon had retaliated against her for having made the requests. The Court denied plaintiff's motion on the bases of untimeliness, undue delay, and prejudice to the defendant. The

---

[7]Curiously, plaintiff contends in her response to Exelon's motion that "regardless of any summary judgment decision [regarding failure to accommodate], the matter would remain pending on the claim of 'disability discrimination' . . . which is an entirely separate claim." (ECF No. 71, Pl.'s Resp. to Def.'s Mot. 3.) Plaintiff is evidently referring to an ADA claim for disparate treatment, but she has not asserted such a claim in this case. She has not alleged, sought to allege, or presented any argument that Exelon treated her differently from anyone else on the basis of her disability.

8

Court later denied plaintiff's motion to reconsider that ruling. Thus, the only basis upon which plaintiff can proceed on her reasonable-accommodation claim is Exelon's alleged failure to accommodate her request to be transferred to a position other than armed security officer. Although Exelon urges the Court that it should not consider argument about other requested accommodations, it advances a backup argument that there is no evidence that Gunty could have returned to her position even with such accommodations. Plaintiff, in turn, devotes much of her brief and fact statement to what she alleges was Exelon's "failure to engage in a timely, good-faith interactive process with Gunty to identify and to provide reasonable accommodations that would have enabled her to return to her position as an Armed Security Officer with an accommodation . . . ." (Pl.'s Resp. to Def.'s Mot. 3.) But the Court will not consider evidence or argument on a claim that is not contained in plaintiff's complaint and on which it denied plaintiff leave to proceed. The Court has therefore disregarded fact statements and argument related to this claim and has considered only those related to the claim in the complaint that Exelon failed to accommodate plaintiff's request to be transferred to a different position.

"A reasonable accommodation claim derives directly from the ADA statute; a plaintiff attempting to prove such a claim must make out a *prima facie* case by establishing the statutory elements." *Curtis*, 807 F.3d at 224. "A plaintiff claiming failure of reasonable accommodation must show: '(1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate the disability.'" *Id.* (quoting *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013)).

For purposes of its motion, Exelon does not dispute that it was aware that plaintiff had a disability, but contends that it is entitled to summary judgment because there is no issue of material fact as to the first and third elements of a reasonable accommodation claim. Exelon's first argument

9

is that Gunty has no evidence sufficient to create a genuine factual dispute as to whether she was a qualified individual with a disability. A "qualified individual" is a person who, "'with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 417 (7th Cir. 2016) (quoting 42 U.S.C. § 12111(8)). "In determining whether a person is a qualified individual, we apply a two-step process. First, we determine whether the person satisfies the prerequisites for the position, such as possessing the proper educational background, employment experience, skills, or licenses. We then consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* (internal quotation marks and citations omitted). "'In response to an employer's motion for summary judgment, it is the plaintiff's burden to produce evidence sufficient to permit a jury to conclude that she would have been able to perform the essential functions of her job with a reasonable accommodation.'"• *Id.* at 418 (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013)).

What seems to get lost in the parties' discussions is the need to examine the evidence as it existed at the time plaintiff requested an accommodation. In her brief, plaintiff evades the issue and fails to specify (and identify supporting evidence of) the point at which she (or one of her medical treaters) made even an ambiguous request for reassignment to another position. Instead, plaintiff contends that she "requested consideration for a non-security position," (Pl.'s Resp. to Def.'s Mot. 5), through her independent submission of applications for three OSS positions in July, August, and September 2012. She states in her affidavit that she faxed or emailed, or had Patricia fax or email, these applications and/or her resumé to the fax number or email box at Exelon Corporation as specified on the relevant job posting. (Gunty Aff. ¶¶ 4, 5, 8.) The problem for plaintiff, however,

10

is that she points to no evidence that she asked for these positions as an accommodation or contacted the Human Resources department about the positions, in the context of transferring to them when returning from medical leave.[8]

The only record evidence that could arguably be construed as a request by plaintiff for an accommodation by way of an alternative job position is counsel's letter of October 29, 2012 stating that Gunty "require[d] accommodation" and that she had "applied for other non-security positions."[9] There is no evidence that at that time, plaintiff's medical treaters had cleared her to return to work full time (or, for that matter, part time).[10] When Peed received counsel's letter, she searched for

---

[8]Furthermore, plaintiff failed to disclose these applications during discovery. In response to defendant's interrogatory that asked plaintiff to "[s]tate the basis for each and every fact that supports, negates, or relates to the allegation in Paragraph 12 of the Complaint that you asked for a less stressful position other than Armed Security Officer," and asked plaintiff to identify all documents related thereto, plaintiff identified only applications related to two OSS positions, one in the Engineering department (the one identified by Peed) and one in the Radiation Protection department, which are discussed below. (ECF No. 81-1 at 5-6.) Moreover, when asked at her deposition whether she had been aware of any other jobs that were open during summer or fall 2012 for which she was minimally qualified, plaintiff identified only those two positions.

Plaintiff contends that the position for which she applied in September 2012 did not require passing the SASS test. For this proposition, plaintiff relies solely on the job posting, which did not mention the test. But Exelon submits unrebutted evidence that the position (which was subsequently canceled and re-posted as the Engineering position) did require passing the SASS test.

[9]As quoted above, the letter also stated that in the alternative, plaintiff "require[d] an extended paid leave of absence," but plaintiff does not claim that defendant's failure to extend her such leave constituted a failure to provide a reasonable accommodation.

[10]Plaintiff asserts that Dr. Ustas told an OHS employee on September 19, 2012 that "she believed Gunty could work in other positions at Exelon." (ECF No. 72, Pl.'s L.R. 56.1(b)(3)(C) Stmt. ¶ 46.) That assertion is not supported by the materials plaintiff cites and is therefore disregarded. Although Dr. Ustas states this belief in her declaration, she does not identify at what point in time she came to this conclusion. (ECF No. 72-4, Decl. of Leah Ustas, M.D. ¶ 15.) On October 31, 2012, Dr. Ustas stated to Hartford in connection with plaintiff's application for long-term disability benefits that she believed Gunty could work, "but not at her current occupation." (ECF No. 81-4.) She did not specify, however, with what accommodations or under what conditions Gunty could work, and there is no evidence that Dr. Ustas (or Linda Gjerde) made any return-to-work recommendation at the relevant time.

11

open positions for which plaintiff might be qualified and identified only an open OSS position in the Engineering department.[11] Thereafter, Malone (of Human Resources) contacted plaintiff about the SASS test[12] because passing that test was a prerequisite for the position. Plaintiff took that test but did not pass. The unrebutted evidence is that plaintiff did not satisfy the prerequisites for the position she desired, and therefore she was not a qualified individual. Furthermore, there is no evidence that at the relevant time, plaintiff's medical treaters had cleared her to return to work with or without accommodations.

Even if Gunty could demonstrate that she was a qualified individual with a disability, she fails to submit evidence from which a jury could find that Exelon failed to reasonably accommodate her disability. "[A]n employer may be required to reassign a disabled employee to a vacant position if the employee no longer can perform the essential functions of the job she holds." *Jackson v. City of Chi.*, 414 F.3d 806, 812-13 (7th Cir. 2005). The federal regulations implementing the ADA contemplate an "interactive process" between the employer and employee in order to determine the appropriate accommodation for a qualified individual with a disability. 29 C.F.R. § 1630.2(o)(3); *see also Jackson*, 414 F.3d at 813. After the employee has communicated her disability and asked for an accommodation, "the employer has the burden of exploring with the worker the possibility of a reasonable accommodation." *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000).

---

[11]Plaintiff argues that in addition to the Engineering department position, there was also an open OSS position in the Radiation Protection department. Exelon submits unrebutted evidence, however, that this was a union position for which plaintiff, as a non-union member, did not qualify. In any event, plaintiff does not dispute that the Radiation Protection position also required passing the SASS test.

[12]Plaintiff's unsupported suggestion to the contrary is belied by ECF No. 81-8, an email from Malone to plaintiff seeking confirmation that plaintiff would attend the SASS test on November 16, 2012, and further stating: "Thank you, again, for your interest in the Office Service Specialist position at our Braidwood Station."

Plaintiff maintains that Exelon caused a breakdown in the interactive process. But the Court of Appeals has held that when considering the success of this process, courts "first look at whether there is a genuine issue of material fact regarding the availability of a vacant position to accommodate" the employee. *Jackson*, 414 F.3d at 813; *see also Hansen*, 233 F.3d at 523 (a breakdown in the interactive process is "academic" when the employer can show that no reasonable accommodation was possible). "The employer need only transfer the employee to a position for which the employee is otherwise qualified." *Jackson*, 414 F.3d at 813. The employer is only obligated to assign an employee to vacant positions and is not required to create a position or move other employees to create a vacancy. *Gile v. United Airlines, Inc.*, 213 F.3d 365, 374 (7th Cir. 2000). To ultimately prevail on an ADA claim, it is the plaintiff's burden to show that at the time of the adverse employment decision, a vacant position existed for which she was qualified. *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 856 (7th Cir. 2015); *Jackson*, 414 F.3d at 813. The vacancy must have been for a permanent position. *Ozlowski v. Henderson*, 237 F.3d 837, 842 (7th Cir. 2001).

Although Gunty maintains that Exelon caused a breakdown in the interactive process, the record contains no evidence that at the time of her termination, there was a vacant position at any Exelon company for which she was qualified. Because plaintiff has failed to create a triable issue of fact on her ADA claim, the Court grants Exelon's motion for summary judgment as to Count I of the complaint.

**B.     Title VII (Count II)**

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.

§ 2000e-2(a)(1). Plaintiff alleges that Exelon discriminated against her on the basis of sex.

Exelon argues that there is no evidence that would allow plaintiff to prevail on her Title VII claim. In response to Exelon's motion, plaintiff cites boilerplate law on the methods of proving a Title VII claim but fails to then make any argument that she was discriminated against on the basis of her sex. Rather, she cites a First Circuit decision in which that court recognized a "sex-plus" theory of discrimination, which is based upon allegations that an employer disparately treated a subclass of employees based on sex in conjunction with another characteristic. (Pl.'s Resp. to Def.'s Mot. 21 (citing *Chadwick v. Wellpoint, Inc.*, 561 F.3d 38 (1st Cir. 2009).)

The Seventh Circuit has not yet decided whether it recognizes a sex-plus theory of discrimination. *See Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009). But in any event, Exelon is entitled to summary judgment on plaintiff's Title VII claim because plaintiff failed to allege a sex-plus theory in her complaint. *See Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 638 n.2 (7th Cir. 2001) ("refus[ing] to analyze" plaintiff's Title VII claim under such a theory because in her complaint she had pleaded only discrimination on account of her race). Moreover, plaintiff's argument is wholly undeveloped. Although plaintiff contends that an Exelon OHS employee accused her of feigning postpartum depression and the employee "believed [plaintiff] made lifestyle choices she was not comfortable with; needing to be home with her infant and other children and be supported financially at the same time," plaintiff fails to identify the "plus" characteristic upon which Exelon allegedly discriminated against her. (Pl.'s Resp. to Def.'s Mot. at 22.) Plaintiff merely states that she "satisfies the sex-plus standard" without any further explanation, discussion of the evidence, or discussion of authority beyond summarizing *Chadwick*. Accordingly, the Court grants Exelon's motion as to plaintiff's Title VII claim.

## CONCLUSION

The Clerk of Court is directed to amend the case caption to 1) add "LLC" to the name of defendant Exelon Nuclear Security and 2) label Optum Inc. as a "Third Party" instead of a "Third Party Defendant." Defendant Exelon Nuclear Security, LLC's motion for summary judgment [49] is granted. Judgment will be entered in favor of Exelon Nuclear Security, LLC and against plaintiff. Civil case terminated.

**SO ORDERED.**  **ENTERED:** April 18, 2017

_____
**JORGE L. ALONSO**
**United States District Judge**